*D/F*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SHILOH HYLTON,                                              **MEMORANDUM & ORDER**

                                    Petitioner,              **05-CV-4077 (NGG)**

                    -against-

ROBERT E. ERCOLE, Superintendent,
Greenhaven Correctional Facility,

                                    Respondent.
-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Petitioner Shiloh Hylton ("Hylton") seeks a writ of habeas corpus under 28 U.S.C.

§ 2254. (See Amended Petition ("Petition") (Docket Entry # 15).) In September 2000, Hylton

was convicted of felony murder, in violation of N.Y. Penal Law § 125.25(3). Hylton is currently

serving an indeterminate sentence of twenty years to life imprisonment in a state correctional

facility. For the following reasons, his Petition is denied.

I.      **BACKGROUND**[1]

        At approximately 5:00 a.m. on April 4, 1999, Lonnie Tillery ("Tillery") shot and killed

Wendell Rosiclair ("Rosiclair") during the course of a robbery. Hylton was identified and

convicted as one of Tillery's two accomplices. The other accomplice was never apprehended.

---
[1] Background facts come from Hylton's trial transcript ("Tr."), a pretrial Wade hearing ("Wade Tr."), and from the
Respondent's Affidavit in Opposition and accompanying Memorandum of Law. (Docket Entry # 7.) Hylton
expressly concurs with all the factual and procedural statements in Respondent's Opposition, except to the extent
that he objects in his Reply and to the extent that they implicate him in the crime. (See Reply (Docket Entry # 20)
¶¶ 3-6.)

1

On the day of the murder, Rosiclair and his friends spent the early morning at Jennelle's Rose Garden, a Brooklyn nightclub. When they left, Tillery and his two accomplices followed them to Negesti Chung's ("Nicky") home on 35th Street in Brooklyn. While Rosiclair and some of his friends were standing in the street, Tillery and his two accomplices walked towards them, under the illumination of a street light. One of the assailants said "you know what this is." (Tr. at 746-47, 756.) They demanded money and other valuables. (Tr. at 750.) One of the assailants demanded Rosiclair's necklace, but as Rosiclair struggled to remove it from his neck, Tillery shot and killed him. (Tr. at 751-53.) The assailants then walked back towards their vehicle and fled. (Tr. at 754.) The exchange lasted approximately two to three minutes. (Tr. at 757.)

Following Rosiclair's murder, NYPD detectives received information from a confidential informant that two of the assailants were known on the street as Lonnie and Shiloh. According to the informant, the two were at Jennelle's Rose Garden the previous morning. The informant stated that Lonnie was wearing a red Coogie[2] sweater and Shiloh had been wearing a beige-colored outfit. The informant also identified Hylton from police photographs as the person he recognized to be Shiloh.

At Hylton's trial, Rebecca Etoria ("Etoria") was the only witness who identified Hylton as Tillery's beige-clad accomplice. She first saw the man she eventually identified as Hylton while she was waiting in line to enter Jennelle's Rose Garden. At approximately 1:00 a.m., she saw several men jump a barricade to get inside the nightclub. (Tr. at 729-732.) One of them was wearing a red Coogie sweater, another, a beige outfit. (Tr. at 735-37, 748.) Once inside the nightclub, Etoria stood beside some of the same people who had jumped the barricade, including Tillery and the beige-clad assailant. (Tr. at 748.) The record, however, does not indicate how long she stood near them. During the robbery, Etoria sat in the front passenger seat of one of the

---

[2] Coogie is a designer clothing brand.

cars that Rosiclair's friends drove to Nicky's house, where she had an unobstructed view of the three assailants as they walked towards Rosiclair and his friends. (Tr. at 754-55.) She testified that the beige-clad assailant "looked directly" at her as they walked past the car that she was sitting in. (Tr. at 746-47.) After Tillery shot Rosiclair, the three assailants walked back to their vehicle, again passing Etoria. Etoria testified that Tillery and the beige-clad assailant glanced at her as they walked past and that the beige-clad assailant glanced longer than Tillery did. (Tr. at 747, 754.) As the assailants fled, Etoria realized that they were some of the same people who she had seen jump the barricade outside the nightclub and who had stood beside her inside the nightclub. (Tr. at 758.) At 8:25 a.m., a few hours after Rosiclair's murder, Etoria described the beige-clad assailant to an NYPD Detective as wearing a khaki jacket, a cream shirt, a Yankee cap, beige and black sneakers, and a beige bandana. (Tr. at 778-79, 782-83; Wade Tr. at 15-16.) She explained that the khaki jacket was a "beige/stone/khaki" color. (Tr. at 787.)

On April 6, 1999, an NYPD detective asked Etoria to view a computerized photo array at the stationhouse. (Wade Tr. at 92-93.) The photo array comprised head-shot photographs of six black men, including one of Hylton. (See Color photo array.) The photo-array subjects have little to no facial hair, are not wearing glasses, and appear to be of roughly similar age. They share similar hairstyles, complexions, and are all photographed against a white background, with little to no shadow. They are all wearing clothes of various colors that are only visible around their necks and shoulders. Each subject is wearing an undershirt, an outer shirt, and either a jacket or sweatshirt. Although some of the clothing worn by Hylton in his photo is lighter than the clothing worn by the other subjects, no picture stands out because of clothing. At a pretrial hearing, Detective Didonato testified that Etoria identified Hylton from the array as the assailant

wearing the beige bandana around his face and under his nose on the night of Rosiclair's murder. (Wade Tr. at 93, 122.)

Shortly after Etoria's identification, NYPD detectives located Hylton at an appointment with his parole officer. As detectives approached Hylton at the parole office, Hylton blurted out, "Yo, I know what this is about. It is about this Rolex and some of my friends supposedly had killed this guy." (Wade Tr. at 23.) The detectives asked Hylton whether he knew Tillery. (See Tr. at 1658.) Hylton responded that he did not. (See id.) The detectives took Hylton into custody and searched him. On his person, they found a beige Yankee cap, a beige bandana, and some party flyers that were distributed at Jennelle's Rose Garden on the night of Rosiclair's murder. (Wade Tr. at 24-25.) They also found a photograph of Tillery's son in his wallet. (See Tr. at 1658.)

On April 9, 1999—five days after Rosiclair's murder—an NYPD detective asked Etoria to view a lineup at the stationhouse. (Tr. at 760.) The lineup comprised six black males, including Hylton; all were seated and wore surgical caps. When a detective asked whether she recognized anyone from the night of the shooting, Etoria identified Hylton as the "the guy with the beige outfit that was at the shooting and in the club." (Tr. at 762.) According to Etoria, Hylton was wearing the same beige shirt in the lineup that the beige-clad assailant had worn on the night of Rosiclair's murder. (Tr. at 795.) At Hylton's trial, however, Etoria testified that she did not pick Hylton from the lineup based on his clothing. (Tr. at 803.) She testified that she identified him based on his eyes and face. (Tr. at 799, 800-02.) Detective Hector corroborated this account at a pretrial hearing, in which he testified that upon identifying Hylton from the lineup, Etoria stated that she remembered Hylton's eyes and that they had the "same chinky

4

look." (Wade Tr. at 33.) Two photographs of Hylton's lineup were admitted into evidence at trial.[3] (Tr. at 798-800.)

On the same day that Etoria identified Hylton from a lineup, the NYPD assembled a second lineup with different fillers for Nicky. (Wade Tr. at 35.) In this lineup, Nicky indicated that Hylton "look[ed] familiar." (Wade Tr. at 37.) According to Detective Hector, Nicky stated that she thought Hylton was at the nightclub the night of the murder, but that she did not want to identify the wrong guy. (Id.) The police did not conduct any other lineups to identify Hylton as one of the assailants. (Id.)

On May 8, 2000, a New York Supreme Court Justice held a combined Dunaway-Mapp, Wade, and Huntley hearing. The judge found that there was probable cause for Hylton's arrest and denied Hylton's motion to suppress his statements, property, and Etoria's lineup identification. The judge, however, precluded Nicky's lineup identification from trial for procedural reasons.

A.    **Hylton's Trial**

At Hylton's trial, Etoria identified Hylton as "the guy wearing the khaki outfit at the club and at the shooting, and outside of the club." (Tr. at 772.) She also testified about her lineup identification. (Tr. at 760-62.) She testified that she had no doubt that Hylton was the person who she identified as the beige-clad assailant. (Tr. at 772.) Etoria testified that the beige-clad assailant was wearing khaki pants, a khaki jacket, a khaki baseball cap, and a khaki-color bandana covering the lower part of his face. (Tr. at 743-44, 792-93.) She also testified that the assailant wore his baseball cap down to the middle of his head and that the beige bandana covered the lower part of his face from just above his top lip. (Tr. at 744, 799.) Defense counsel

---

[3] Respondent only submitted one of the two lineup photos to this court. Respondent could not locate the second photo. (See Neubort Ltr. dated Apr. 7, 2009.)

cross-examined Etoria about her recollection of Hylton as the beige-clad assailant. He questioned her, inter alia, about photographs of Hylton's lineup and a prior inconsistent statement in which Etoria stated that the beige bandana covered the assailant's face from "half his nose down." (Tr. at 793.)

At the close of evidence, the trial judge gave a lengthy jury instruction regarding Hylton's identification. He told the jury that it must find beyond a reasonable doubt that Hylton was the right man, in light of all the evidence presented "from whatever source." (Tr. at 1658-60.) The judge instructed the jurors to examine Etoria's identification testimony in light of the circumstances surrounding the crime. (Tr. at 1660.) He told them to consider the opportunity that Etoria had to observe the person who she identified as the defendant, the lighting conditions at the time, the length of time between when she saw and identified him, the distance between them, and any distinctive characteristics or clothing worn by that person. (Tr. at 1660.) The judge told the jury that it must also evaluate Etoria's credibility, mental capacity, ability to reason, ability to observe and remember the physical features and other characteristics of the assailant. (Tr. at 1660.) The judge emphasized that in considering all the evidence, the jury should carefully appraise whether Etoria's physical description of the assailant matched Hylton's physical characteristics. (Tr. at 1660-65.) The judge, however, explained that because the physical description that Etoria gave to police shortly after the crime may match many people other than only Hylton, her initial description could only be used to evaluate the opportunity she had to observe the assailant's characteristics and her mental capacity to reason, but not to determine whether she accurately identified Hylton as the perpetrator. (Tr. at 1660-65.)

The trial judge also reminded the jury that Etoria identified Hylton at a lineup five days after the crime, and in court seventeen months later. (Tr. at 1661.) He instructed the jury that it

6

could consider Etoria's prior lineup identification together with all the other relevant evidence in evaluating the accuracy of her in-court identification. (Tr. at 1661-62.) The judge further instructed the jury that "the witness's prior identification of the defendant should nevertheless be scrutinized by you with care." (Tr. at 1662.)

In his instructions, the judge marshaled the parties' evidence and contentions regarding Hylton's identification as the beige-clad assailant. He recounted that Etoria identified Hylton as the "person who participated in the robbery." (Tr. at 1656-57.) He recounted the prosecution's contention that Etoria's lineup identification tends to support her in-court identification because it shows that she did not rely solely on a possibly stale memory. (Tr. at 1662.) He summarized the evidence that the prosecution offered to corroborate Etoria's identification: that Hylton was arrested with a scarf and baseball hat, which were identified as resembling the scarf and hat that one of the robbery participants wore; that when Hylton was arrested, he stated that he knew why the police were looking for him and that he knew someone was killed during a robbery involving a Rolex watch; that witnesses correctly identified Tillery as Rosiclair's killer, and that Hylton initially denied knowing Tillery, but had a picture of Tillery's child with him when he was arrested. (Tr. at 1657-58.) The judge also recounted the prosecution's contentions that Hylton was seen with Tillery at a christening party before the robbery and at the nightclub and that Hylton was arrested with a flyer that was similar to flyers given out at the nightclub on the night of Rosiclair's murder. (Tr. at 1658.)

Regarding the defense, the trial judge recounted the defense's claim that Etoria mistakenly identified Hylton at the lineup and that she only identified him at trial because of that earlier, mistaken identification. (Tr. at 1662.) He summarized the defense contentions: that the seized scarf and baseball cap are common items that many people have, that witness descriptions

of them were not sufficiently detailed, and that no witness described the Yankee logo on the cap in evidence; that the prosecution's proof was insufficient to show that Hylton denied knowing Tillery upon initial questioning by the police, but even if he denied knowing Tillery, it may have been for another reason, not necessarily because he was involved in a shooting with Tillery; that Hylton only found out about the crime by speaking to a friend; that the prosecution did not prove that the flyer he was arrested with was distributed at the nightclub; and that even if Hylton was friends with Tillery and that he was at a christening party with Tillery before the shooting, it did not necessarily follow that Hylton was with Tillery for the whole night. (Tr. at 1658-60.)

In September 2000, the jury convicted Hylton of felony murder, in violation of N.Y. Penal Law § 125.25(3).

### B. Post-trial Procedural History

#### 1. Direct Appeal

On direct appeal, Hylton raised the following claims: (1) the prosecution failed to prove his guilt beyond a reasonable doubt and that his conviction is against the weight of the evidence; (2) the trial court denied him due process by admitting pretrial identifications arising from (i) an unduly suggestive photo array in which he was the only individual wearing "beige-type" clothing described by the identifying witness and (ii) from an unduly suggestive lineup in which the police used fillers who all appeared older than him and in which he was the only individual wearing beige clothing; (3) the prosecution's failure to produce on appeal the pretrial photo array admitted into evidence at his Wade hearing denied him effective appellate review of his claim that the photo array was unduly suggestive; (4) the trial court denied him due process and a fair trial by impairing his alibi and misidentification defenses because it (i) precluded defense counsel from eliciting that, before she knew when the shooting occurred, his main alibi witness

had informed the police that he was home during the shooting, and (ii) incompletely summarized defense counsel's mistaken identification defense in the jury charge. (See App. Br., Table of Contents.) Hylton's appellate brief cites the United States Constitution and New York state law to support each of his claims. (See id.)

Hylton also raised the following claims in a supplemental pro se brief: (1) that he "was deprived [of] his constitutional right to present evidence[] and witnesses on his behalf, and his constitutional right to a fair trial by a combination of [a] prosecutorial Brady violation and the court's bias handling of such"; (2) that he "was deprived of his state and, federal constitutional rights to a fair trial by the actions of the trial judge in denying [him] the ability to make and preserve matters for the appellate court's review"; (3) that he "was deprived of his state and federal constitutional rights to a fair trial and due process of law by the prosecutor's knowingly and willfully improper use of evidence which was patently false."

The Appellate Division unanimously affirmed Hylton's conviction. People v. Hylton, 2 A.D.3d 459 (2d Dept. 2003). It found that Hylton's "challenge to the legal sufficiency of the evidence [was] unpreserved for appellate review." Id. at 460. It further stated that "[i]n any event, viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that the "verdict was not against the weight of the evidence." Id. (internal citation omitted).

Regarding Hylton's second claim, the Appellate Division agreed that Hylton's lineup was unduly suggestive because Hylton "was the only person in the lineup wearing the beige color which had figured prominently in the witness' description of one of the perpetrators." Id. at 459-60. The Appellate Division declined to reverse Hylton's conviction on this basis, however, reasoning that the suggestive lineup did not "create a substantial likelihood of misidentification"

because "[t]he witness who identified the defendant at the lineup had identified the defendant at a prior photographic array and also had the opportunity to view the defendant before, during, and after the shooting." Id. at 460.

Addressing the second part of Hylton's fourth claim—incomplete summarization of his misidentification defense—the Appellate Division held that the "trial court's marshaling of the evidence did not deprive the defendant of his right to a fair trial." Id.

The Appellate Division found that Hylton's "remaining contentions, including those raised in his supplemental pro se brief, either are unpreserved for appellate review or without merit." Id.

On March 16, 2004, the New York Court of Appeals denied Hylton leave to appeal the Appellate Division's decision. See People v. Hylton, 2 N.Y.3d 741 (2004) (table decision).

2.    Post-Conviction Relief in State Court

On May 18, 2005, Hylton filed a motion to vacate his judgment of conviction in State Supreme Court under N.Y. Crim. Proc. § 440.10. See People v. Hylton, No. 3354/99, 2005 WL 2623684 (N.Y. Sup. Ct. Oct. 14, 2005) ("Hylton § 440"). Hylton claimed that he was denied effective assistance of counsel because his "trial lawyer did not call as a witness and declined to interview a prospective prosecution witness who had 'recanted.'" Id. at *2. In a supplemental submission, Hylton further claimed that his trial attorney rendered ineffective assistance of counsel by not moving to reopen his suppression hearing. Id. at *3. The Supreme Court denied Hylton's § 440 motion as procedurally barred by N.Y. Crim. Proc. Law § 440.10(2)(c), finding that adequate facts appeared in the record for Hylton to have raised his claim on direct appeal. Hylton § 440, 2005 WL 2623684, at *4. In the alternative, the court found Hylton's ineffective assistance of counsel claims to be without merit. Id. at *4-5.

On July 25, 2006, the Appellate Division denied Hylton's petition for writ of error coram nobis to vacate his conviction for ineffective assistance of appellate counsel. See People v. Hylton, 31 A.D.3d 786 (2d Dept. 2006). The Court of Appeals denied Hylton leave to appeal that decision. See People v. Hylton, 7 N.Y.3d 902 (2006) (table decision).

### C.    Hylton's Federal Habeas Claims

Hylton's claims in this proceeding are identical to those he raised on direct review. His Petition comprises the table of contents to his appellate brief on direct appeal and the table of contents to his "pro se supplemental brief," which he also submitted on direct appeal. (See Petition, Ex. 1.)

## II.    LEGAL STANDARDS

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal district court may grant a writ of habeas corpus only with respect to a claim "that was adjudicated on the merits in State court proceedings" and only when adjudication of that claim resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "A decision involves an 'unreasonable application' of clearly established federal law if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the

facts of a particular prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (quoting Williams, 529 U.S. at 407-08 (internal citations omitted)). Under this deferential standard, a federal court may not grant a writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009). The state court must have unreasonably applied federal law.

### B. Procedural Default

Under the adequate and independent state grounds doctrine, federal habeas courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Id. at 729-30. The court can consider a defaulted claim only if the "prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," i.e., that he or she is actually innocent. Id. at 750; see also Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003).

A procedural default, however, bars federal review only when the "state court . . . actually . . . relied on the procedural bar as an independent basis for its disposition of the case." Harris v. Reed, 489 U.S. 255, 261-62 (1989) (internal quotation marks omitted). Because it can be difficult to determine whether a state court decision rests on an independent and adequate state procedural rule, federal habeas courts "presume that there is no independent and adequate

state ground . . . when the decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." Coleman, 501 U.S. at 735 (internal quotation marks omitted). That is, the "Harris presumption," in favor of federal review, applies when there is "good reason to question whether there is an independent and adequate state ground for the decision." Id. at 739.

Within this framework, the Second Circuit has held that certain dispositions used by New York appellate courts preserve or foreclose federal habeas review. When a state court finds that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, the decision rests on a state procedural ground, barring federal habeas review. Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir. 1996). The underlying rationale is that state courts "need not fear reaching the merits of a federal claim in an alternative holding" when they expressly rely on an adequate and independent state procedural bar Id. (quoting Harris, 489 U.S. at 264 n.10). But when a state court rules that a "defendant's remaining contentions are either unpreserved for appellate review or without merit," the state court's holding is construed to rest on federal law, permitting federal habeas review. Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 (2d Cir. 2000). In this situation, the state court has not adequately indicated that its judgment rests on a state procedural bar because its reliance on local law is not clear from the face of the opinion. Id. at 811. "[T]he 'either/or' language introduces uncertainty sufficient to render the decision 'interwoven with federal law.'" Jiminez v. Walker, 458 F.3d 130, 140 (2d Cir. 2006).

If a federal court finds that a state court decision rests on an independent state ground, it must further determine whether that ground is adequate to support the judgment. As a matter of federal law, a "state law ground is only adequate to support the judgment and foreclose review of

a federal claim if it is 'firmly established and regularly followed' in the state" and if "application of the rule in a particular case is [not] 'exorbitant.'" Garvey v. Duncan, 485 F.3d 709, 713-14 (2d Cir. 2007) (quoting Lee v. Kemna, 534 U.S. 362, 376 (2002)).

The same analysis that determines whether a claim is procedurally barred also determines whether a state court is entitled to AEDPA deference under 28 U.S.C. § 2254(d). See Jiminez, 458 F.3d at 145-46. Under the common analysis, a federal habeas claim is either procedurally barred by adequate and independent state law or is deemed to have been adjudicated on the merits in state court and is entitled to AEDPA deference. See id.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Hylton claims that the state did not prove his guilt beyond a reasonable doubt and that his conviction is against the weight of the evidence, in violation of the United States Constitution. He asserts that because Etoria, the sole witness who identified him at trial, was not credible, the prosecution did not present sufficient evidence to support his conviction. (See Petition 1.) On direct appeal, the Appellate Division found that Hylton did not preserve this claim for appellate review and, in the alternative, found it be without merit. Hylton, 2 A.D.3d at 460 (citing N.Y. Crim. Proc. Law § 470.05 (contemporaneous objection rule)).

Under New York law, counsel must make a timely and specific objection to preserve claims of error at trial for appellate review. See N.Y. Crim. Proc. Law § 470.05. New York's contemporaneous objection rule applies to claims challenging the sufficiency of the evidence. See People v. Hawkins, 11 N.Y.3d 484, 492 (2008). And federal courts recognize it as an adequate and independent state ground. See Richardson v. Green, 497 F.3d at 212, 219 (2d Cir. 2007).

The Appellate Division held that Hylton did not preserve his sufficiency challenge for appellate review. Although the Appellate Division alternatively found that Hylton's challenge was without merit, federal habeas review is barred. The Appellate Division expressly rested its holding on Hylton's failure to preserve the claim for appellate review. See Glenn, 98 F.3d at 724-25. There is no indication that the Appellate Division applied the contemporaneous-objection rule in an exorbitant manner. And Hylton has not demonstrated cause for the default, nor does he assert that he is factually innocent. For these reasons, Hylton's sufficiency claim is procedurally defaulted and cannot be considered by this court.

## B. Pretrial Identifications

Hylton claims that the trial court denied him due process by admitting pretrial identifications arising from an unduly suggestive photo array and an unduly suggestive lineup. (See Petition 2; Reply 18.) Hylton claims that his photo array was unduly suggestive because he was the only subject wearing "beige-type color" clothing. (Id.) He claims that his lineup was unduly suggestive because the other individuals in the lineup appeared to be much older and because he was the only person wearing beige. (Id.)

On direct appeal, the Appellate Division ruled that Hylton's lineup challenge was "partially unpreserved for appellate review, and in any event, [was] without merit." Hylton, 2 A.D.3d at 459. The court went on to state that:

> In view of the fact that the defendant was the only person in the lineup wearing the beige color which had figured prominently in the witness' description of one of the perpetrators, the lineup was unduly suggestive. Reversal is not mandated, however, because the suggestive procedure did not create a substantial likelihood of misidentification. The witness who identified the defendant at the lineup had identified the defendant at a prior photographic array and also had the opportunity to view the defendant before, during, and after the shooting.

Id. at 459-60 (internal citations omitted). The Appellate Division did not specifically address whether Hylton's photo-array identification was unduly suggestive.

As a threshold matter, the court must determine whether adequate and independent state law forecloses federal habeas review of Hylton's identification challenges. The Appellate Division's ruling—that Hylton's lineup challenge was partially unpreserved for appellate review, but without merit in any event—falls between the "either unpreserved or without merit" and "unpreserved and without merit" dispositions used by New York courts that permit and foreclose federal habeas review, respectively. See Fama, 235 F.3d at 810; see Glenn, 98 F.3d at 724-25. Although the Appellate Division's decision in this case relies on New York's conjunctive and reviewable disposition, the phrase "partially unpreserved" creates ambiguity as to which part of Hylton's lineup challenge rests on an adequate and independent state ground. Because of this ambiguity, district courts within this circuit generally find that no procedural bar arises from such a disposition.[4] In these circumstances the Harris presumption preserves a claim for habeas review because the Appellate Division's equivocal "partial preservation" disposition, in conjunction with a ruling on the merits, introduces sufficient uncertainty to render its decision "interwoven with federal law." Jiminez, 458 F.3d at 140. Accordingly, Hylton's "partially unpreserved" lineup challenge is preserved for habeas review. Because the Appellate Division did not specifically address Hylton's photo-array challenge, it falls into the Appellate Division's catch-all ruling that Hylton's "remaining contentions" are "either unpreserved for appellate review or without merit," and is also preserved for federal habeas review. See Fama, 235 F.3d at 810.

---

[4] See, e.g., Byron v. Ercole, No. 07-CV-4671 (BMC), 2008 WL 2795898, at *7 (E.D.N.Y. Jul. 18, 2008); Louis v. Fischer, No. 04-CV-2887 (NGG), 2007 WL 4198255, at *9 (E.D.N.Y. Jun. 25, 2007); Garcia v. Greiner, No. 01-CV-2470 (JG), 2004 WL 943902, at *3 n. 2 (E.D.N.Y. Apr. 28, 2004); McCaskell v. Keane, No. 97-CV-2999 (GWG), 2001 WL 840331, at *14 (S.D.N.Y. Jul. 26, 2001) (Report & Recommendation).

The Fourteenth Amendment to the United States Constitution prevents the introduction of unreliable identification testimony. See Brisco, 565 F.3d at 88. Criminal defendants have a due process right "mandating that identification testimony must not lead to the likelihood of irreparable misidentification as a result of impermissibly suggestive procedures." Kennaugh v. Miller, 289 F.3d 36, 44 (2d Cir. 2002) (discussing Manson v. Brathwaite, 432 U.S. 98, 116 (1977)). Whether identification testimony is reliable depends on a two-part sequential inquiry. See Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).

First, a court must determine whether the "identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Id. At this step, a pretrial identification procedure is unduly suggestive when the suggestive elements make "it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact [the perpetrator]." Foster v. California, 394 U.S. 440, 443 (1969). This may occur when the defendant "meets the description of the perpetrator previously given by the witness and the other . . . participants obviously do not." Raheem, 257 F.3d at 133.

If the procedures are not suggestive, "no further inquiry by the court is required, and the "reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." Id. at 133 (internal quotation marks omitted). But when an identification procedure is unduly suggestive, a witness's identification testimony is only admissible if, at the second step, the court determines that it is independently reliable of the suggestive identification procedure. Whether identification testimony is independently reliable depends on the totality of the circumstances and the following non-exhaustive factors: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree

of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972). Independent reliability can be established through testimony given at trial or at a pretrial hearing. See, e.g., Watkins v. Sowders, 449 U.S. 341, 349 (1981).

The precise standard for admissibility depends on whether the identification evidence is of (1) an identification rendered at an impermissibly suggestive out-of-court procedure or (2) a later in-court identification following the impermissibly suggestive out-of-court procedure. Evidence of an unduly suggestive out-of-court identification is admissible only if the procedure was not so impermissibly suggestive to give rise to a very substantial likelihood of misidentification. Biggers, 409 U.S. at 198. An in-court identification following an unduly suggestive out-of-court identification is admissible only if the out-of-court procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968) (emphasis added); see Biggers, 409 U.S. at 198 (the "standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable'. . . serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself"). But, in both situations, "reliability is the linchpin" for "determining the admissibility of identification testimony." Brathwaite, 432 U.S. at 106 n.9, 114.[5]

---

[5] See Raheem, 257 F.3d at 135 (applying Biggers factors to determine whether an in-court identification was tainted following an impermissibly suggestive out-of-court identification); Brisco, 565 F.3d at 89 (applying Biggers factors to determine the reliability of an out-of-court identification).

2.    Application

Hylton challenges the Appellate Division's conclusion that admitting Etoria's identification testimony at trial did not violate his due process rights.  Hylton claims that his lineup and photo array identifications were impermissibly suggestive and that the Appellate Division's holding was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Hylton does not challenge the state court's factual determinations under 28 U.S.C. § 2254(d)(2); and whether admitting Etoria's identification testimony deprived Hylton of due process is a question of law. See Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir. 2009).

Etoria's identification testimony comprised two parts.  She identified Hylton in open court and she testified about her prior lineup identification.  She did not testify about her photo-array identification.  The Appellate Division did not distinguish between Etoria's in-court identification and her out-of-court identification testimony; it found that while Hylton's lineup was unduly suggestive, the procedure "did not create a substantial likelihood of misidentification." Hylton, 2 A.D.3d at 459-60.  The Appellate Division did not expressly consider whether Hylton's photo array was impermissibly suggestive.

At the first step of the due process analysis, the Appellate Division correctly found that Hylton's lineup was unduly suggestive under clearly established federal law.  The clothing that Hylton wore in the lineup matched the only description that Etoria gave of Tillery's accomplice, while the clothing worn by the other participants in the lineup did not.[6] See Raheem, 257 F.3d at 134.  A few hours after Rosiclair's murder, Etoria told detectives that one of Tillery's

[6] Respondent only submitted one of two photographs of Hylton's lineup admitted at trial.  Because the court's photo does not capture Hylton's entire lineup, the court cannot independently determine whether Hylton is the only participant wearing beige.  This deficiency in the record is immaterial, however.  Hylton only challenges the admission of Etoria's identification testimony under § 2254(d)(1) and does not challenge the state court's factual determinations under § 2254(d)(2).

accomplices wore a khaki jacket, a light shirt, a Yankee cap, beige and black sneakers, and a beige bandana. And, according to the Appellate Division, Hylton was the only lineup participant who wore beige. Etoria even testified that Hylton wore the same shirt at his lineup that Tillery's accomplice wore on the night of Rosiclair's murder.

Because Hylton's out-of-court lineup was unduly suggestive, the court must determine whether the Appellate Division reasonably applied clearly established federal law to conclude that admitting evidence of Etoria's lineup identification did not create "a substantial likelihood of misidentification" and did not irreparably taint her subsequent in-court identification. Both questions depend on whether Etoria's identification testimony was reliable independent of the impermissibly suggestive elements of the lineup. See Braithwaite, 432 U.S. at 114. Applying the substance of some of the Biggers factors, the Appellate Division reasoned that admitting Etoria's identification testimony did not deny Hylton due process because she identified him in a previous photo array and had an opportunity to view him before, during, and after the charged crime took place.

Because Etoria had several opportunities to view the perpetrator, the first Biggers factor—opportunity to see the assailant—weighs in favor of finding independent reliability. Etoria first saw the person she identified as Hylton entering the nightclub at approximately 1 a.m. on the night of the murder. A few hours later, she saw him again, standing beside her inside the nightclub. And as the robbery and murder unfolded, she had an unobstructed view of the crimes under the light of a street lamp. She testified that the beige-clad assailant "looked directly" at her when he approached Rosiclair and his friends and glanced at her, again, as he fled. In sum, Etoria saw the beige-clad assailant's exposed face twice before the robbery and, because his face was covered by a beige bandana, saw his eyes for approximately two to three

20

minutes during the robbery. Although the fact that the assailant's face was partially covered during the robbery diminished Etoria's opportunity to observe him, Etoria testified that she identified Hylton at the lineup based on his eyes—i.e., the beige-clad assailant's only exposed facial feature during the robbery. Accordingly, the first Biggers factor weighs in favor of finding independent reliability.

The second Biggers factor—witness attention—also weighs in favor of finding independent reliability. During the robbery and murder, Etoria sat in the front passenger seat of one of the vehicles that Rosiclair's friends drove to Nicky's house. She was not herself a robbery victim; she observed the assailants' actions as a spectator, without the distraction of complying with their demands or turning over her valuables. Etoria was focused enough to recall that Hylton wore the exact shirt at the lineup that the beige-clad assailant had worn during the robbery.

Under the third Biggers factor, Etoria's prior description of the beige-clad assailant weighs neither in favor nor against a finding of independent reliability. Beyond the suggestive elements of the lineup, the description that Etoria gave to investigating detectives contains no information to assess its accuracy. Her description was limited to the assailant's beige clothing. She provided no details about the assailant's physical traits until she saw him at the challenged lineup, when she identified Hylton based on his eyes.

The degree of certainty with which Etoria identified Hylton as the beige-clad assailant weighs in favor of finding independent reliability under the fourth Biggers factor. Etoria testified that she had "no doubt" that Hylton was the person she saw at Jennelle's Rose Garden, at the shooting, and in the lineup.

Finally, the length of time between the crime and Hylton's lineup identification weighs the fifth Biggers in favor of finding independent reliability. Etoria identified Hylton in a lineup five days after she observed Rosiclair's murder.

In sum, four of the five Biggers factors favor finding that Etoria's identification testimony was independently reliable. The reliability of her identification cannot, however, be determined without considering that Etoria also identified Hylton in a photo array two days after Rosiclair's murder and three days before the lineup. But if, as Hylton claims, the photo array itself was impermissibly suggestive, it could undermine the reliability of the later lineup identification. The Appellate Division did not expressly consider this issue.

Hylton's challenge to his photo array, however, is without merit. The photo array does not suggest Hylton as a suspect of the police department's investigation. Nothing in the array suggests that any one subject is a robbery suspect or a criminal. Each photo depicts a black male against a white background. No photo stands out: the subjects have similar hairstyles, little to no facial hair, similar complexions, and no glasses or visible jewelry. The only way that the photo array could have suggested Hylton to Etoria is if the clothing in his photo matched Etoria's initial description of the beige-clad assailant's clothing. It does not. Hylton is not wearing beige in his photograph. And, although Hylton's outer garments are lighter in color than those worn by the other subjects, his undershirt is darkly colored, in contrast to the lightly colored undershirts worn by four other subjects. Based on these observations, the court finds that Hylton's photo did not stand out from the other photographs to suggest to Etoria that he was the beige-clad assailant. His photo is as different from the other photos as the other photos are from each other.

The court further finds that Etoria's photo-array identification supports that her identification testimony was reliable. It shows that Etoria identified Hylton from a non-

suggestive procedure several days before her lineup identification. It was independent of the lineup's suggestive elements. In the context of this case, Etoria's lineup identification confirmed her earlier photographic identification. The court is not concerned that Hylton was the only common subject in the photo array and the lineup because Etoria's lineup identification was not the result of her prior photographic identification.[7] She testified that she identified Hylton from the lineup because of his "chinky" eyes, not because she recognized him from a previous identification procedure. See, e.g., Vinston v. Lockhart, 850 F.2d 420, 424 (8th Cir. 1988); United States v. Davenport, 753 F.2d 1460, 1463 (9th Cir. 1985) ("The fact that [the defendant] was the only individual common to the photo spread and the lineup cannot, without further indicia of suggestiveness, render the lineup conducive to irreparable misidentification.").

Accordingly, the Appellate Division did not unreasonably apply clearly established federal law in finding that Etoria's identification testimony "did not create a substantial likelihood of misidentification." Hylton, 2 A.D.3d at 460. The Biggers factors and the totality of the circumstances show that Etoria's identification testimony was reliable.[8]

### 3.    Failure to Produce Hylton's Color Photo Array

In addition to his identification challenges, Hylton claims that the prosecution's failure to produce a color copy of the photo array on direct appeal precluded effective appellate review of his claim that the array was unduly suggestive. The Appellate Division only had a black-and-

---

[7] The court assumes that Hylton was the only common participant in the two identification procedures. The record contains no indication that any of other subjects in the photo array also appeared in the lineup.

[8] Although the Appellate Division should have applied Biggers's "substantial likelihood of irreparable misidentification" standard to Etoria's in-court identification and the "substantial likelihood of misidentification" standard only to evidence of her out-of-court identification, see Biggers, 409 U.S. at 198, this variance is immaterial. The Appellate Division only erred in applying the more demanding standard to Etoria's in-court identification. One commentator writes that "[i]t is unlikely but theoretically possible that there could be a risk of misidentification which was substantial but not irreparable, meaning that in a particular case . . . the pretrial identification would be suppressed but not the at-trial identification by the same person." 2 Wayne R. LaFave et. al, Criminal Procedure § 7.4(c) at 940 (3d ed. 2007). In both cases, reliability is the linchpin of admissibility. See Brathwaite, 432 U.S. at 114.

white copy of the photo array. (See Hylton Appellate Brief 35 n.11.) Because this claim falls into the Appellate Division's catch-all ruling that "defendant's remaining contentions . . . either are unpreserved for appellate review or without merit," Hylton, 2 A.D.3d at 460, it is subject to federal habeas review. It is, however, without merit.

As a general matter, there is no right under the federal constitution that guarantees appellate review of state criminal convictions. See Evitts v. Lucey, 469 U.S. 387, 393 (1985). But "if a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." Id. (internal quotation marks, alterations, and citation omitted). New York law provides that "a defendant has a fundamental right to appellate review of a criminal conviction." People v. Yavru-Sakuk, 98 N.Y.2d 56, 59 (2002).

In this case, the absence of color in the photo did not preclude meaningful appellate review. The record contained a black-and-white copy of the photo array. The Appellate Division also had the benefit of representations that Hylton's attorney made on the record that describe the shades and colors of the clothing visible in the photo array. (See Wade Tr. at 170-71.) Hylton's attorney made these representations in oral argument after Hylton's Wade hearing, in front of a judge who had a color copy of the array before him. Had the Appellate Division needed to further develop the missing facts, it could have resorted to New York's detailed guidelines for handling appellate records with missing exhibits. See People v. Jackson, 98 N.Y.2d 555, 560 (2002). Under these circumstances, this court concludes that Hylton's appellate proceedings did not deny him due process for lack of a color photo array. The Appellate

Division had a substantial factual record concerning the photo array and, if necessary, could have pursued available opportunities to further develop it.

## C. Trial Court Procedures

Hylton asserts several challenges to the conduct of the trial prosecutor and trial court. He claims that the trial court's jury instructions unevenly marshaled the parties' evidence and contentions to impermissibly favor the prosecution; that the trial court was biased in handling an alleged Brady violation, in addition to a stand-alone Brady claim; that the trial court erroneously excluded favorable testimony; that the trial court denied him a fair trial by preventing him from preserving issues for appellate review; and, that the trial prosecutor knowingly presented false testimony. All of these claims were presented to the Appellate Division on direct appeal. The Appellate Division found them to be "either unpreserved for appellate review or without merit." Accordingly, they are subject to habeas review and entitled to AEDPA deference.

With respect to each of Hylton's claims of judicial or prosecutorial conduct, the court notes that federal judges do not have supervisory power over state trial courts. The scope of review on habeas is "the narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (prosecutorial misconduct); see Garcia v. Warden, Dannemora Corr. Facility, 795 F.2d 5, 7 (2d Cir. 1986) (judicial conduct). Within this limited authority, misconduct at trial only warrants relief if it was so significantly adverse to the defendant as to violate constitutional due process. See also Daye v. Attorney Gen. of the State of New York, 712 F.2d 1566, 1572 (2d Cir. 1983).

### 1. Improperly Marshaling Evidence

According to Hylton, the jury instructions unevenly marshaled the parties' proof and contentions relating to identification. Hylton concedes that the trial "court gave a somewhat

detailed identification charge, told the jury to consider the lineup evidence, mentioned petitioner's claim that Etoria 'was mistaken' in her lineup identification, and reminded the panel that petitioner argued that the mistaken lineup selection had influenced Etoria's in-court identification." (Reply Mem. 37.) His marshalling challenge is that the trial judge did not instruct the jury about his contention that the lineup was suggestive or review the facts showing suggestiveness. Id.

The Appellate Division did not unreasonably apply federal law in dismissing this claim. "[D]ue process requires that the jury be permitted to consider and balance all factors relevant to their ultimate determination of the reliability and weight to be given identification evidence." Sales v. Harris, 675 F.2d 532, 540 (2d Cir. 1982). Within this limitation, New York law permits a trial judge to marshal the parties' evidence and contentions to the extent necessary to explain the material legal principles applicable to the case. See N.Y. Crim. Proc. § 300.10(2). Federal habeas relief for an allegedly unbalanced summary of the parties' contentions, however, is available only if the trial court's instructions were so significantly adverse as to violate a defendant's constitutional right to due process. See Johnson v. Scully, 727 F.2d 222, 226-27 (2d Cir. 1984) (applying the Daye standard to habeas claims for unevenly marshaled trial evidence).

The jury instructions in this case did not deny Hylton due process of law. The trial judge instructed the jury to "consider all the evidence you heard . . . from whatever source" in deciding whether Hylton was the right man. He instructed the jury to consider Etoria's credibility and mental capacity to observe, remember, and reason about the assailant's physical features and other characteristics; the opportunity that Etoria had to observe the perpetrator; the distance between them; any distinctive characteristics or clothing; the lighting conditions during the crime; the length of time between the crime and her identification; and the fact that she

previously identified Hylton in a lineup. The judge expressly conveyed Hylton's contention that Etoria mistakenly identified him in the lineup and that her in-court identification stemmed from that mistaken lineup identification. In light of these extensive instructions regarding the defense's positions, the court cannot find that the Appellate Division unreasonably applied federal law in dismissing Hylton's claim.

### 2. Brady Claim

Hylton asserts that the prosecution did not timely disclose that Tillery told detectives and the district attorney's office that he was present during Rosiclair's murder, that he did not kill Rosiclair, and that Hylton was not present at the crime. (Tr. at 825-26.) The prosecution disclosed this information during Hylton's trial, six days before the defense presented its case. At this time, Tillery was already convicted of Rosiclair's murder. (Tr. at 826-29.) The trial judge stated that although the information was arguably Brady material, it was of no consequence because Hylton had not established prejudice from the untimely disclosure and because Hylton must have already known about the information. (Tr. at 827-29.) The day after the prosecution disclosed the information, defense counsel indicated to the court that he would not call Tillery to testify.[9] Instead, he sought to introduce Tillery's statements through a detective as a statement against Tillery's penal interest. (Tr. at 843-44.) The trial court ruled that Tillery's statement could only be admitted into evidence if Tillery became "unavailable" by invoking his constitutional right to remain silent. (Tr. at 994.) The defense never called Tillery to testify and his statement was not admitted into evidence.

---

[9] In his reply brief, Hylton also claims that the trial court erred in refusing the defense's request for Tillery to take the stand. This claim is contradicted by the trial transcript. Defense counsel indicated to the court that he did not wish to call Tillery to testify. (Tr. at 843-44.)

Under Brady v. Maryland, 373 U.S. 83 (1963), prosecutors must disclose material exculpatory evidence. A true Brady violation has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The state court did not unreasonably apply federal law in finding that Hylton did not establish prejudice from the prosecution's mid-trial disclosure. Earlier disclosure would not have altered his trial strategy. The disclosure only provided Hylton with additional evidence for alibi and misidentification defenses that he was already pursuing. And Hylton had six days to integrate the disclosed information into his case before calling his first witness. Should he have needed more time, Hylton could have sought a continuance. The trial court's evidentiary rulings and comments on this issue do not show an unconstitutional bias towards Hylton.

### 3. Excluded Testimony

Hylton's mother testified at trial that he came home after 1 a.m. on the morning of Rosiclair's murder and that she saw him sleeping at 5 a.m., the approximate time of Rosiclair's murder. (Tr. at 1294, 1296-97.) Defense counsel further sought to elicit from Hylton's mother that when the police initially questioned her, and before she knew when Rosiclair was killed, she told police that Hylton was sleeping at home at 5 a.m. (Tr. at 1299-1300.) The trial court precluded Hylton's mother from testifying about the substance of the conversation that she had with the police on hearsay grounds. (Tr. at 1301.) On cross-examination, Hylton's mother testified that she did not know that a shooting had occurred or that Hylton was suspected of committing a crime when the police first questioned her. (Tr. at 1324-25.) Hylton contends that eliciting her prior consistent statement, made before his mother knew when Rosiclair was

murdered, would have rebutted the prosecution's contention that his mother's trial testimony was the product of collusion with other defense witnesses to fabricate an alibi. By excluding the testimony, Hylton claims that the trial court violated his constitutional rights under the Sixth and Fourteenth Amendments.

Evidentiary rulings are generally not reviewable in federal habeas proceedings. "[H]abeas corpus relief does not lie for errors of state law, and that necessarily includes erroneous evidentiary rulings." Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (internal quotation marks and citation omitted). If an evidentiary ruling correctly applied a state evidentiary rule, habeas inquiry is limited to consider whether the evidentiary rule is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" Id. (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). Under this standard, "exclusion of evidence [is] unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at 308. But if "potentially exculpatory evidence was erroneously excluded," the question is whether in the context of the entire record the omitted evidence creates a reasonable doubt that did not otherwise exist. Hawkins, 460 F.3d at 244.

Under New York law, "[i]f upon cross-examination a witness' testimony is assailed—either directly or inferentially—as a recent fabrication, the witness may be rehabilitated with prior consistent statements that predated the motive to falsify." People v. McDaniel, 81 N.Y.2d 10, 18 (1993). Under this standard, the trial judge correctly precluded defense counsel from eliciting from Hylton's mother the statement that she made before she knew that Hylton was suspected of a crime. It is inadmissible hearsay. Defense counsel sought to introduce the testimony on direct examination, before the prosecution had an opportunity to impeach Hylton's mother with a motive to falsify testimony. In attempting to elicit the challenged testimony,

defense counsel expressly stated that he intended to rebut an <u>anticipated</u> allegation of fabrication. (<u>See</u> Tr. at 1300 ("[t]he allegation <u>may be</u> . . . that this is manufactured, that she knew about the time at this point and this was manufactured.").) The trial court's application of New York's hearsay rule was not arbitrary or disproportionate in this case; Hylton's mother provided live testimony for the same information allegedly contained in her out-of-court statement. For this reason, even if the trial court erroneously excluded the challenged testimony as hearsay, its admission would not have created a reasonable doubt that did not otherwise exist. For these reasons, the Appellate Division did not unreasonably apply federal law in rejecting Hylton's claim of erroneously excluded testimony.

### 4.    Inability to Preserve Claims for Appeal

Hylton claims that his trial court denied him due process by preventing him from preserving claims for appellate review. According to Hylton, the trial judge "repeatedly denied defense counsel the ability to make specific objections during the trial and made improper remarks to defense counsel in front of the jury" suggesting that defense counsel was acting in an inappropriate manner. (Reply 64.) Hylton claims that the trial judge acted as if he had a "direct personal interest in the outcome of the trial." (Reply 68.)

The examples that Hylton cites in support of his claim do not rise to the level of a due process violation.[10] They show the trial judge's efforts to efficiently conduct a criminal trial. Whether those efforts were merely inappropriate is a question beyond the scope of this court's habeas authority. This court can only review the trial judge's conduct for constitutional violations. <u>See</u> <u>Garcia,</u> 795 F.2d at 7.

---

[10] Hylton's examples include, among others, the judge admonishing both the prosecutor and defense counsel for improper trial conduct (Tr. at 1434 ("Ladies and gentlemen, disregard the behavior of the attorneys, it's improper, both of them.")); advising defense counsel that unless he stipulates to a fact, the prosecution is entitled to prove it (Tr. at 893); and, preventing defense counsel from pursuing a "misleading" line of hypothetical questioning (Tr. at 973-75).

5.    Prosecutorial Misconduct

Hylton alleges that his trial prosecutor denied him a fair trial by presenting patently false evidence. In substance, however, Hylton's claim is that his trial prosecutor cross-examined a defense witness with a prior inconsistent statement for which he did not have a good-faith basis. The facts underlying this claim do not support a constitutional violation.

Similar to alleged judicial misconduct, the standard for prosecutorial misconduct claims on federal habeas review is "the narrow one of due process, and not the broad exercise of supervisory power." Darden, 477 U.S. at 181. "To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (applying due process analysis to improper questioning by the prosecution). Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim. See Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003).

At trial, the prosecutor asked one of Hylton's alibi witnesses, his fiancé, if she knew Shaquana Wheet, and had told Wheet that "Shiloh came home acting all nervous" on the morning of Rosiclair's murder. (Tr. at 1448-49.) The witness denied knowing Wheet and denied making any statements to her. (Id.) At the close of trial, defense counsel moved for a mistrial, asserting that Wheet is not a real person and that the prosecution thus lacked a good-faith basis to ask the alibi witness about her. (Tr. at 1481-82.) The prosecutor responded that a confidential informant raised Wheet's name during the course of his investigation but that he was unable to contact her. (Tr. at 1483.) The prosecutor, however, was unable to represent whether Wheet actually existed. (Tr. at 1482-83.) The trial judge denied the motion "pending further conversations" with the prosecutor, presumably for an in-camera disclosure. (Tr. at 1483.)

Even if the prosecutor did not disclose his proffered good-faith basis to the judge—which he must have because defense counsel's motion was denied—the Appellate Division did not unreasonably apply federal law in dismissing this claim. The prosecutor's questions about Wheet were not so egregious as to have denied Hylton a fair trial; the witness denied either knowing Wheet or making the challenged statement to someone by that name. The entire exchange fills less than one page in the trial transcript, and immediately follows questions about whether the witness knew three other individuals, two of whom she denied knowing. (Tr. at 1447-49.) Accordingly, the Appellate Division did not unreasonably apply federal law in dismissing Hylton's prosecutorial misconduct claim.

## IV.     CONCLUSION

For the foregoing reasons, Hylton's petition for habeas corpus under 28 U.S.C. § 2254 is DENIED. Because Hylton has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253(c)(2).

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     June _2_ 2010

NICHOLAS G. GARAUFIS
United States District Judge